UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ANTHONY ELLIOT HERNANDEZ,

                                   Plaintiff                     DECISION AND ORDER

-vs-

                                                       15-CV-6764 CJS

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                                  Defendant.
_____

APPEARANCES

| | |
|---|---|
| For the Plaintiff: | Elizabeth A. Haungs |
| | Kenneth R. Hiller |
| | Law Offices of Kenneth Hiller |
| | 60000 North Bailey Avenue, Suite 1A |
| | Amherst, New York 14226 |
| | |
| For the Defendant: | Emily M. Fishman |
| | Social Security Administration |
| | Office of General Counsel |
| | 26 Federal Plaza, Room 3904 |
| | New York, New York 10278 |
| | |
| | Kathryn L. Smith, A.U.S.A. |
| | Office of the United States Attorney |
| | for the Western District of New York |
| | 100 State Street |
| | Rochester, New York 14614 |

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Anthony Hernandez ("Plaintiff") for Supplemental

1

Security Income Benefits ("SSI"). Now before the Court is Plaintiff's motion (Docket No. [#10]) for judgment on the pleadings and Defendant's cross-motion [#13] for judgment on the pleadings. Plaintiff's application is denied and Defendant's application is granted.

BACKGROUND

The reader is presumed to be familiar with the parties' submissions, which contain detailed recitations of the pertinent facts. The Court has reviewed the administrative record [#8] and will offer only a brief summary of those facts.

On July 16, 2011, Plaintiff was taken to the emergency room ("ER") at the University of Rochester Medical Center by New York State Troopers who had arrested him. (408-409). Plaintiff told ER staff that the officers had pulled him over and arrested him for DWI after he failed a breathalyzer test, that the officers handcuffed him, and that as the officers were attempting to place him in a patrol car, he ran away, after which the officers caught him and slammed him to the ground. Plaintiff characterized the officers' actions as an "assault." (409). Plaintiff claimed that he had lost consciousness briefly, though the officers denied that. (409). ER staff treated Plaintiff for skin abrasions on his right knee, face and right temple. *Id*.

In 2012, Plaintiff worked very briefly at an unspecified job, and earned $189. (164). Plaintiff has not worked since that time.

Between May 2013 and June 2013, Plaintiff served a criminal sentence in the Monroe County Jail. This incarceration was apparently unrelated to the aforementioned arrest in 2011, as Plaintiff indicated that it was for "drug possession," not DWI. (296, 298). In any event, on May 9, 2013, jail security staff reportedly told jail medical staff

2

that Plaintiff was "acting strangely." (271). A nurse visited Plaintiff, who seemed upset

that he had not received mental health treatment, and instructed him that he could

request medical attention using the "sick call" forms. (271). The following day, May 10,

2013, Plaintiff reportedly complained to jail medical staff that he was not receiving

mental health medications, and requested sleeping pills. (270-271). The examining

nurse noted that Plaintiff's mood was stable, with no evidence of thought disorder. The

nurse further stated:

> [Inmate] rambled extensively giving conflicting and untrue information with
> no clear goal for sharing information. [Inmate] points out blame on his
> family, the community and the police and deputies for the problems he's
> had in his life. Does not engage in any feedback or redirection except
> when confronted with sharing false information then admits to lying.

(271).

On May 24, 2013, Plaintiff told a jail nurse that he was having nightmares. The

nurse reported that Plaintiff had a "flat affect and staring eye contact." (270). Plaintiff

further stated that he had been informed three days earlier that his cousin had been

killed in the military in Iraq. However, a jail security officer informed the nurse that

Plaintiff had told him that the cousin had been killed in 2009. (270). On May 27, 2013,

Plaintiff told another jail nurse that he was having trouble sleeping, and that he "saw"

the face of his cousin, who "died last summer in Iraq." (270). The nurse noted that

Plaintiff was "easily irritated" and had "intense staring eye contact." (270). On May 28,

2013, a jail deputy asked medical staff whether Plaintiff had been evaluated for mental

health issues, since he acted strangely and seemed to have "difficulty understanding

and following rules." (270). Medical staff transferred Plaintiff to the mental health unit

for evaluation. (269-270).

On May 29, 2013, jail psychiatrist Robert Stern, M.D. ("Stern"), examined Plaintiff and diagnosed "PTSD likely, THC dependence and [illegible] syndrome of worsening anxieties." (280). Stern indicated that Plaintiff attributed his alleged PTSD symptoms to two events: 1) "an assault with a blade in his face as a teen," and 2) the death of "a close family member [in the] Middle East." (280). Stern made the "THC dependence" diagnosis based on Plaintiff's statement that he smoked marijuana five times per week and "c[ould]n't deal with his anxiety without it." (280). Stern apparently prescribed Paxil and Neurontin to address Plaintiff's anxiety and cravings for marijuana. (281). On June 21, 2013, Plaintiff reportedly indicated that he felt calm and was sleeping well. (269). On June 24, 2013, Plaintiff reportedly indicated that his "depression and anxiety [were] significantly improved." (269).

On August 5, 2013, shortly after being released from jail, Plaintiff received a mental health evaluation at Unity Health System ("Unity") in Rochester. (295-298). Carolyn Gavett, MS MHC ("Gavett") performed the evaluation. Gavett reported that Plaintiff's mental status exam was unremarkable, except that his "thought process" indicated "hopelessness." (297). When asked if he had suffered any trauma or abuse, Plaintiff indicated that he had been "assaulted by a police officer," apparently referring to the 2011 arrest, and that he had been "stabbed" in 2011. Gavett wrote: "He does not report any other trauma or abuse except for when he was stabbed and reportedly assaulted by a police officer." (296, 298). Plaintiff indicated that he used marijuana to "self medicate," but had not used it since going to jail. (295). Plaintiff complained of anxiety, depression and nightmares, and said that these symptoms had worsened when

4

he went to jail. (298).  Plaintiff related his limited work history, and stated that he did not like working for other people or having people tell him what to do. (296).

On August 13, 2013, Plaintiff submitted an application for SSI benefits. Plaintiff maintained that he became unable to work on May 1, 2013, while he was in jail, though the significance of that date is unclear. (171).  Plaintiff claimed to be disabled due to "anxiety," "PTSD" and "depression." (171). Plaintiff's application painted a bleak picture of his overall condition.  In particular, Plaintiff indicated that he needed help bathing himself (180), did not groom his hair or beard (179-180), and had very limited activities of daily living. (181-183).  For example, Plaintiff stated that he could not perform household chores because of "fatigue, fever." (181, 183).  Plaintiff further stated that he went "nowhere, pretty much," and only ventured outside once every two or three days, due to "anxiety, depression." (181, 183).  Plaintiff further stated that he was unable to handle money or pay bills, though he did not explain why. (182).  Plaintiff stated that his hobbies and activities were reading, watching television and attending church "sometimes." (182-183).  Plaintiff indicated that he had difficulty lifting, standing, walking, climbing stairs, kneeling, squatting, reaching, using his hands, and talking. (183-184).[1]  Curiously, Plaintiff also stated that he needed a cane to ambulate. (185). Plaintiff elaborated that the cane was prescribed by his doctor, and that he needed the cane "always." (185).  Plaintiff stated that he could walk for only "maybe 5 min." (185). Plaintiff further stated that he had difficulty paying attention due to "listening problems,

_____

[1]These references to alleged physical impairments in the SSI application are puzzling, since Plaintiff's alleged physical impairments were the result of an accident that did not occur until  2014, long after Plaintiff had completed this statement. (228-229) (Motor vehicle accident on October 20, 2014 with neck and back injury); (31) ("back injury related to a car accident in October [2014]").

lack of interest," was unable to follow either spoken instructions or written instructions, and had difficulty getting along with persons in positions of authority due to "difficulty understanding, paperwork." (185).

On August 14, 2013, Plaintiff sought medical treatment for a wound to his left leg. (372). Plaintiff reported that on August 8, 2013, he had injured the leg when he fell off a "motor bike." (372). Plaintiff was prescribed antibiotics. (372).

On September 9, 2013, Christine Ransom, Ph.D. ("Ransom") conducted a consultative psychiatric evaluation in connection with Plaintiff's SSI application. (309-312). Plaintiff told Ransom that he had walked six miles to get to the appointment (309), though he had previously indicated that he could not walk for more than five minutes and needed a cane to ambulate. Plaintiff reportedly told Ransom that his medical history was limited to being treated for psoriasis, and that he had never been hospitalized. (310). Plaintiff also reportedly told Ransom that he had no history of drug abuse, omitting any reference to his daily marijuana usage. (310). Plaintiff further told Ransom that he had just spent three months in jail for DWI, even though he was actually jailed for drug possession. (310, 296, 298).

Plaintiff told Ransom that he "had never been able to hold a job due to emotional problems." (309). In that regard, Plaintiff stated that he was having "nightmares, flashbacks, intrusive thoughts, anger, fear and depression," relating to incident that had occurred "about two years [earlier, when] he was attacked by two men wearing masks who repeatedly struck him in the face with a pipe causing fractures to his face. They left him bleeding and and for dead. He crawled to a neighbor's house to seek help." (309). Plaintiff further told Ransom that he was experiencing crying spells, irritability,

low energy, difficulty concentrating, loss of motivation and discomfort around people. (309).  Plaintiff also claimed to experience "panic attacks" several times per day, beginning after the aforementioned alleged assault. (310).

Plaintiff told Ransom, however, that he could perform activities of daily living such as dressing and bathing himself, grooming himself, cooking and preparing food, performing household chores like cleaning and laundry, shopping and managing his own money. (311).  Plaintiff also stated that he lived with his mother, but did not socialize with family or friends. (311).

Upon examination, Ransom noted that Plaintiff seemed withdrawn, non-spontaneous, lethargic, depressed, irritable and anxious. (310).  Ransom concluded that Plaintiff's  attention, concentration and immediate memory were "moderately impaired," though his cognitive functioning was average and his insight and judgment were good. (311).  Ransom's diagnosis was PTSD, "currently moderate to marked," panic disorder "currently moderate to marked," and major depressive disorder, "currently moderate." (312).  Ransom noted that Plaintiff was not currently taking any mental health medication (309), but opined that his prognosis would be "fair to good with continued treatment." (312).   Regarding Plaintiff's ability to work, Ransom stated, in pertinent part:  "This individual will have moderate difficulty following and understanding simple directions and instructions, performing simple tasks independently, maintaining attention and concentration for simple tasks, maintaining a simple regular schedule and learning simple new tasks." (311).

On September 13, 2013, state agency psychological consultant T. Harding, Ph.D. ("Harding"), completed a report in connection with Plaintiff's application for SSI

benefits. (69-78). Harding indicated that he had reviewed, *inter alia*, Ransom's report, as well as Plaintiff's records from Unity and evidence concerning Plaintiff's activities of daily living. (70-71). Harding indicated that he gave "great weight" to Ransom's report, noting that Ransom's opinion was "consistent with [her] exam." (74). Harding concluded that Plaintiff had moderate limitations in areas including the ability to understand and remember simple instructions, the ability to maintain attention and concentration for extended periods and the ability to perform activities within a schedule and maintain regular attendance. (74). Nevertheless, Harding found that Plaintiff retained the ability to work: "The claimant retains the ability to perform simple work with limited stress and limited contact with others." (76). In arriving at this determination, Harding indicated that he found Plaintiff's complaints only "partially credible," based upon Plaintiff's activities of daily living. (73). Specifically, Harding observed that Plaintiff had only "mild" limitations in his activities of daily living. (72-73). Based upon Harding's opinion, the Commissioner denied Plaintiff's application for benefits. (85).

On December 22, 2013, Gavett wrote a report discharging Plaintiff from mental health treatment at Unity. (240-243). Gavett indicated that Plaintiff was being discharged because he had attended three therapy sessions, but then stopped attending, and had not responded to her phone call or to multiple letters:

> Anthony attended three individual therapy appointments and processed his current stressors. Explored how he has started to help himself and Anthony has been making doctor's appointments, applied for DHS and also applied for SSI. Plaintiff missed appointment writer sent letter of concern for him to call and schedule and called patient. Anthony did not respond to letter and another letter sent with a date and time for patient to make and keep an appointment or the case would be closed. He did not

respond to this letter and his case was closed.

(240).  Gavett reported that prior to April 2013, Plaintiff had been smoking "2-10 [marijuana] blunts a day," but did not believe that he had a problem with substance abuse. (242).

In July, 2014, Plaintiff sought mental health treatment from a different provider, Genesee Mental Health. (Ex. 7F, 336).  Plaintiff claimed to be seeking treatment because he felt worried and scared. (341).  On July 30, 2014, Erica Hahn, LMSW ("Hahn") completed a "psychosocial assessment/admission note." (344-345).  Plaintiff reportedly told Hahn that he had stopped attending mental health appointments at Unity because he had been attempting to find employment. (342).  Plaintiff claimed to have suffered a "broken eye socket" in 2012, from being assaulted. (342).  Plaintiff also claimed to have a history of auditory and visual hallucinations. (341).

On September 25, 2014, Plaintiff's clinical coordinator at Genesee Mental Health, Michele Caponi, LMHC ("Caponi"), reported that Plaintiff claimed to be having "flash backs/intrusive thoughts and nightmares associated with [an] assault 2 yrs. ago." (336).[2]  Plaintiff's diagnosis was depressive disorder not otherwise specified, anxiety

---

[2]Although the ALJ did not discuss it in his decision, and while it does not affect the outcome of this decision, the Court is bothered by the fact that Plaintiff has given numerous inconsistent explanations to support his alleged PTSD symptoms.  Plaintiff told Ransom that he had been savagely beaten with a pipe wielded by masked men who left him "bleeding and for dead" (309).  However, there is not a shred of medical or other evidence to support this story.  Indeed, the tale that Plaintiff related to Ransom is just one in a series of inconsistent explanations that Plaintiff has offered to treatment providers to support his claim of PTSD.  Elsewhere in the record Plaintiff indicated that his PTSD stemmed from being "assault[ed] with a blade in his face as a teen" (280), from being "stabbed" (236, 296), from being "assaulted" in or about 2011 (85), from being assaulted in 2012, resulting in a "broken eye socket" that required surgery (342), and from being assaulted by police officers. (236, 296).  Of these statements, the only one for which there is any substantiation is the alleged "assault" by police officers in 2011, in which Plaintiff suffered abrasions while attempting to escape from custody.  There is no medical evidence concerning treatment for a pipe assault, stabbing or fractured eye socket, and, to the contrary, Plaintiff told Ransom that he had never been hospitalized. (309).

disorder not otherwise specified and cannabis dependence. (336).

On October 27, 2014, Plaintiff told Caponi that he was taking Paxil as prescribed, and that his feelings of anxiety and hopelessness had decreased, but that he was still experiencing PTSD symptoms. (350). On the same date, Plaintiff reportedly told Caponi that he had been in a car accident, and had not suffered injury but was having "generalized muscle stiffness." (350). A subsequent MRI test indicated no traumatic injuries, but at most "mild to moderate" stenosis of the cervical spine at C5-C6. (320).

On November 11, 2014, Plaintiff reportedly told Caponi that he had stopped taking Paxil, but had re-started after two days because his depression symptoms had increased. (351). Plaintiff also told Caponi that he was smoking "2-3 joints marijuana/day." (351). On December 23, 2014 Plaintiff told Caponi that he had recently reduced his marijuana intake to one joint per day. (352).

On January 7, 2015, Plaintiff applied for vocational rehabilitation services through New York State Education Department's Office of Career and Continuing Educaton Services ("ACCES-VR"). (244-247). In particular, Plaintiff was seeking money to assist him in buying a barber's chair. (244).

In connection with that application, Plaintiff completed a report concerning his health and work abilities. Plaintiff stated that his disabilities were "mental, PTSD, anxiety, depression," which made it "hard to stay focused and cooperate with others [and caused] feelings of unbearable stress." (244). Plaintiff claimed that he had a history of "mental/emotional conditions," "allergies," "asthma, "seizure disorder/epilepsy" and "head injury," that made it "hard for [him] to understand paperwork and . . . to get along with coworkers." (247). Plaintiff indicated that he had "some difficulty" with

10

walking, reading and working with people, but otherwise had "no difficulty" with physical activities or with doing arithmetic. (246).   Plaintiff stated that he lived with his mother, step father, and brother, and that he had a driver's license and access to a vehicle. (245).  Most significantly, Plaintiff indicated that he was capable of working full time. (247).

In connection with Plaintiff's application for vocational services, he had Caponi complete a "Treatment Report," using a form provided by ACCES-VR.  (262-264). Notably, Caponi's report agreed that Plaintiff could work full time.  In that regard, Caponi indicated that  Plaintiff was "comfortable working alone [and] work[ed] best alone," and experienced "stress" "when in a group." (263).  Nevertheless, Caponi stated that Plaintiff's "work ability" was "excellent," provided that he could work alone and that "the work [was] of interest" to him. (263).

Plaintiff reportedly told his counselor at ACCES-VR, Brian Van Slyke ("Van Slyke"), that his problems involved paranoia, lack of focus when performing repetitive tasks, and increased sweating around "large social crowds." (248).  Plaintiff apparently told Van Slyke about the 2011 DWI incident, but not the 2013 drug conviction. (249) ("Anthony had a misdemeanor DWI conviction in 2011 where he spent 75 days in jail. He reports no other legal involvement.").  Plaintiff also incorrectly indicated that he had no history of drug usage. (247).  Plaintiff told Van Slyke that he lived with his mother and brother, who were "very supportive of him." (248).  Plaintiff reportedly also told Van Slyke that "[h]e graduated in 2013 with his real estate certification from the Greater Rochester Association of Realtors in Henrietta, NY." (249).  Indeed, Plaintiff reportedly told Van Slyke that he had recently been "hired" by a real estate company, "Berkshire

Hathaway Real Estate in Spencerport, NY," and needed assistance from ACCES-VR to buy "clothing and equipment" in order to "'save his job' at the real estate company." (249, 254-255). Van Slyke opined that "[t]he occupation of real estate salesperson [was] a good occupation for Anthony to pursue." (255). Van Slyke noted that Plaintiff had exhibited some "bizarre behavior" during a previous intake session, but had subsequently attributed such behavior to the fact that he had the flu and had been feeling nauseous during the intake session. (249-250, 255).

On January 12, 2015, Julia Mitchell, N.P. ("Mitchell") of Genesee Mental Health conducted a psychiatric medication review. (353-354). Plaintiff told Mitchell that Paxil was "somewhat effective," but that he was worried about side-effects that he had read about on the internet, and was experiencing low energy and fatigue, which he attributed to the Paxil. (353). Mitchell conducted a mental status examination that was unremarkable, except that Plaintiff seemed irritable and exhibited limited insight and judgment. (353). Significantly, Plaintiff told Mitchell that he had no "difficulty with memory or concentration." (353). Plaintiff reportedly indicated that he had run out of marijuana and could not afford more, and requested that Mitchell provide him with Valium or Xanax. (353). Mitchell wrote that, "Plaintiff ha[d] again requested Valium or Xanax," but that she was "unwilling to prescribe these at this time given patient's substance abuse history and current marijuana use." (354).

On March 30, 2015, Caponi reported that Plaintiff was "non-engaged in therapy," despite her attempts to contact him by letter and telephone. (337). However, that same day Caponi completed a report indicating that she had met with Plaintiff. (355-356). Caponi noted that Plaintiff had stopped taking his prescribed medications (Buspar and

Paxil) because they made him drowsy, but had re-started taking them. (355). Caponi indicated that "without medication client experienced anxiety/panic attacks and difficulty focusing." (355). Plaintiff told Caponi that he could not commit to coming to therapy sessions more than once per month. (355).

On April 23, 2015, Mitchell conducted another psychiatric medication review (422-423), the results of which were unremarkable, except that Plaintiff exhibited limited insight and judgment (422), and seemed "more withdrawn and subdued." (423). Once again, Plaintiff specifically denied having "difficulty with memory or concentration." (422). Nevertheless, Plaintiff told Mitchell that he was anxious and depressed, and was having trouble falling asleep and staying asleep. (422). Mitchell observed that Plaintiff also made "vague" complaints of feeling paranoid. (422). Plaintiff reported that he had broken up with his girlfriend and was living out of his car, but was continuing to exercise regularly at the YMCA. (422). Mitchell suggested that Plaintiff might benefit from an increased dosage of Paxil, and Plaintiff was agreeable to that. (423). Plaintiff told Mitchell that he had used marijuana earlier that day (423), but he "would not divulge [the] amount/frequency" of his overall marijuana use. (424). Plaintiff reportedly told Mitchell that he was continuing to pursue Social Security benefits, but was ineligible for food stamps because he had been caught misrepresenting information on the food stamps application. (424).

On May 18, 2015, Plaintiff and his attorney appeared for a hearing before an Administrative Law Judge ("ALJ"). (24-64). Preliminarily, at the request of Plaintiff's attorney, the ALJ agreed to leave the record open after the hearing, to allow Plaintiff to submit hospital records relating to an "assault," to "help substantiate the basis of the

[alleged] posttraumatic stress disorder." (27).  However, the only such records that Plaintiff subsequently submitted were those mentioned earlier pertaining to his 2011 ER admission following his DWI arrest. (Exhibit 9F, 406-420).  The ALJ also asked Plaintiff's counsel to explain why Plaintiff had missed numerous appointments with Genesee Mental Health, and counsel indicated that it was due to "housing issues" and "transportation issues." (32).

Plaintiff was twenty-five years old at the time of the hearing, and his education consisted of high school (GED) and a two-year college degree. (35).  Plaintiff completed the college program in 2012. (172).  Plaintiff has a very limited work history.  Plaintiff worked during only five years (2005-2008 and 2012), all of which would have been while he was still in high school or college. (172).  Plaintiff's average annual earnings were approximately $3,470. (162-164).  Plaintiff last worked in 2012, during which he earned only $189.  Plaintiff was fired from his last job for being late to work. (164, 171).

Plaintiff testified and claimed to be unable to work due to a combination of both physical impairments and psychological impairments, and specifically the following: 1) neck and back pain; 2) post-traumatic stress disorder (PTSD); 3) anxiety; and 4) depression.

Although Plaintiff had previously told ACCES-VR staff that his mother was "very supportive" of him (248), he told the ALJ that he was living in his car, rather than at home, because his mother was verbally and physically abusive toward him. (36). Plaintiff acknowledged that he stayed with his girlfriend at times.  Despite claiming to live in his car, Plaintiff also stated that he passed time during the day by "just stay[ing] home or go[ing] on the computer probably . .  to watch videos." (51).  Plaintiff also

indicated that he went to the YMCA to exercise several times per week. (47-50). Despite the alleged hostility from his mother, Plaintiff admitted that she paid for his auto registration, auto insurance and YMCA membership. (39, 47, 50).

When asked about having missed mental health appointments in the period leading up to the hearing, Plaintiff testified that he had forgotten them, and alternatively stated that his "car's gear shaft broke trying to get out of a snow bank and [he] had a [parking-ticket ]boot put on [the] car at the same time," which caused him to fall "into a really bad depressive state [in which he] didn't do anything for a couple of weeks." (45-46).

When asked to explain why he allegedly had difficulty getting along with co-workers, Plaintiff stated that it was because people expected him to praise them too much. (52).

In addition to taking testimony from Plaintiff, the ALJ also took testimony from a Vocational Expert ("VE"). (58-63).

On July 18, 2015, the ALJ issued a written decision denying Plaintiff's claim for SSI benefits. (11-19). Applying the familiar five-step sequential analysis used for evaluating disability claims, the ALJ found at the first three steps, respectively, that Plaintiff had not engaged in substantial gainful activity since August 1, 2013; that he had severe impairments consisting of depression, anxiety, PTSD and mild cervical and lumbar disc disease; and that none of those impairments met or medically equaled a listed impairment. (13-14). Prior to reaching the fourth step of the sequential analysis, the ALJ made the following residual functional capacity ("RFC") finding: "[C]laimant has the [RFC] to perform medium work . . . with the following limitations:  limited to simple

routine tasks; goal oriented rather than production rate pace work; and occasional interaction with coworkers and the general public." (14).

In making that finding, the ALJ stated that he found Plaintiff's complaints to be only partially credible. (15). The ALJ noted, for example, that although Plaintiff claimed to live in his car because of abuse by his mother, he was financially supported by his mother, had his mail sent to his mother's house, spent his days at home using the computer, and alternatively claimed to live with his girlfriend at times. (15). The ALJ further referred to inconsistencies in Plaintiff's statements concerning his memory and concentration. (16). Further, the ALJ noted that Plaintiff was evasive about the extent of his marijuana usage (16), and made statements about his alleged physical limitations that were inconsistent with his exercise routine at the YMCA. (16-17). Additionally, the ALJ observed that Plaintiff's activities of daily living were not "limited to the extent one would expect given the complaints of disabling symptoms and limitations." (17).

As for weighing the medical evidence, the ALJ indicated that he gave "great weight" to Ransom's opinion: "Great weight is accorded to the opinion of Dr. Ransom. Although she identifies some limitations they are not so severe as to preclude work." (16). However, the ALJ noted that Ransom's exam occurred at a time when Plaintiff was not taking his medication, and had only just begun therapy. (16). The ALJ also gave "great weight" to Dr. Harding's opinion, though he felt that Harding had overstated Plaintiff's exertional ability somewhat. (17).

Based on his RFC determination, the ALJ found at step four of the sequential analysis that Plaintiff was capable of performing his past relevant work as a sales attendant. (17). Alternatively, the ALJ found, at step five, that there were other jobs that

Plaintiff could perform, including "laundry sorter" and "photocopy machine operator." (18). The ALJ accordingly denied Plaintiff's application. Plaintiff appealed, but the Appeals Council denied the application for review (1), thereby making the ALJ's determination the final determination of the Commissioner.

On December 22, 2015, Plaintiff commenced this action. On July 8, 2016, Plaintiff filed the subject motion [#10] for judgment on the pleadings, and on October 4, 2016, Defendant filed the subject cross-motion [#13] for judgment on the pleadings.

## STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

## DISCUSSION

The ALJ's Evaluation of the Medical Evidence

Plaintiff first contends that the ALJ erred by failing to "properly reconcile opinions of record." Plaintiff contends that Ransom's opinion -- that he has "moderate" limitations in areas such as following and understanding simple instructions and directions, performing simple tasks independently and maintaining attention and concentration -- precludes him from performing any work. Plaintiff therefore maintains that while the

17

ALJ purportedly gave Ransom's opinion "great weight," his RFC finding "contradicts" Ransom's opinion. Plaintiff contends that the ALJ failed to adequately explain why he "rejected" Ransom's opinion, which requires reversal because Ransom's opinion establishes that he is disabled.[3]

However, this argument lacks merit. Preliminarily, to the extent that Plaintiff maintains that an ALJ must accept every opinion contained within a report that he generally gives "great weight," he is mistaken. *See, e.g., Torres v. Comm'r of Soc. Sec.*, No. 14-CV-6438P, 2015 WL 5444888, at *11 (W.D.N.Y. Sept. 15, 2015) ("With respect to the ALJ's conclusion that Torres was capable of frequent handling, fingering, and feeling, he was not required to adopt every finding in Chang's assessment to which he otherwise accorded great weight."); *see also, Wallace v. Comm'r of Soc. Sec.*, No. 5:11-CV-26, 2012 WL 461809, at *8 (D. Vt. Jan. 10, 2012) ("ALJs are not required to adopt every facet of each medical opinion to which they afford great weight."), report and recommendation adopted sub nom. *Wallace v. Astrue*, No. 5:11-CV-26, 2012 WL 461816 (D. Vt. Feb. 13, 2012).

Moreover, although the ALJ gave great weight to Ransom's report, his decision as a whole indicates why he did not adopt every opinion expressed therein. For example, the ALJ noted that while Ransom had found that Plaintiff's concentration and memory skills were moderately impaired, Plaintiff himself denied any problems with memory or concentration. (16). Further, the ALJ noted that Ransom rendered her

---

[3]On this point, Plaintiff reasons that Ransom's opinion indicates that he would have at least "occasional limitations in performing simple work," and that according to the VE's testimony, a person with such limitations "would not be able to work in the national economy." Pl. Memo of Law [#10-1] at p. 12.

opinion very early in Plaintiff's mental health treatment history, when he had just started

mental health treatment[4] and was not yet taking medication (16), and that Plaintiff's

mental health symptoms improved with medication. (15) (ALJ stated: "[T]he claimant is

prescribed medications. He reported that Paxil was helpful in January 2015."); *see*

*also*, (269) (Stern reported that Plaintiff's symptoms "significantly improved" with

medication.). Additionally, after stating that the limitations identified by Ransom were

"not so severe as to preclude work" (16), the ALJ continued, in the next three

paragraphs of his decision, to cite various evidence which he interpreted as indicating

that Plaintiff was exaggerating his symptoms. (16-17). For example, the ALJ referred to

Plaintiff's statement, to ACCES-VR, that he "could work full time but did not want a high

stress job or to be in crowded environments." (17).

     Plaintiff also contends that Dr. Harding's report cannot constitute substantial

evidence because it was "stale," due to having been based on an incomplete record,

meaning that additional medical evidence was received after the date of Harding's

report.[5] For example, Plaintiff contends that Harding did not have Plaintiff's jail medical

record or the records from Genesee Mental Health when he rendered his opinion.

Plaintiff goes so far as to state: "Clearly, any opinion rendered prior to this treatment

cannot constitute substantial evidence."[6]

     However, Plaintiff's insistence that the ALJ should have accepted Ransom's

---

[4] Actually, the record indicates that when Ransom rendered her opinion, Plaintiff was still being evaluated by Unity and had not actually started therapy sessions.

[5] Pl. Memo of Law [#10-1] at p 15-16.

[6] Pl. Memo of Law [#10-1] at p. 17.

opinion and rejected Harding's opinion as stale makes no sense, since Ransom's report pre-dated Harding's, and was therefore "more stale" than Harding's. Moreover, Harding's report was arguably better supported, as it was based upon Ransom's report and upon medical records that Ransom had not seen. (70-71).[7] In any event, Plaintiff is incorrect to assert that a medical opinion is stale merely because it pre-dates other evidence in the record, where, as here, the subsequent evidence does not undermine Harding's conclusions. *See, Camille v. Colvin*, 652 F.App'x 25, 28 n. 4, 2016 WL 3391243 (2d Cir. Jun. 15, 2016) ("No case or regulation Camille cites imposes an unqualified rule that a medical opinion is superseded by additional material in the record, and in this case the additional evidence does not raise doubts as to the reliability of Dr. Kamin's opinion.").

Plaintiff also contends that the ALJ erred by claiming to have given "great weight" to the opinions of both Ransom and Harding, since the two opinions are "contradictory." According to Plaintiff, the ALJ failed to explain "how these two divergent opinions were reconciled in the RFC."[8] However, the Court does not agree that the two reports are contradictory or inconsistent.

To the contrary, Harding essentially adopted Ransom's conclusions, except, in

---

[7]While the ALJ did not mention this point, the Court notes that Ransom's opinion was based at least in part on a mistaken set of facts. As noted earlier, Ransom's report indicates that Plaintiff denied any history of drug use. If Ransom had known that Plaintiff was actually a daily marijuana user it might well have affected her opinion. However, the Court is not relying on this observation to affirm the Commissioner's decision.

[8]Pl. Memo of Law [#10-1] at p. 17.

pertinent part, with regard to Plaintiff's mental ability to perform simple tasks.[9]  With regard to such tasks, Ransom opined that Plaintiff would "have moderate difficulty following and understanding simple directions and instructions [and] performing simple tasks" (311), while Harding found that, with regarding to "understanding and memory," Plaintiff would be moderately limited  in understanding and remembering very short and simple instructions, but, with regard to "sustained concentration and persistence," would *not* be significantly limited in carrying out those instructions. (74).  Insofar as Harding's findings differ from Ransom's on this point, the reason appears to be that Harding found Plaintiff's complaints to be only "partially credible," based on the extent of Plaintiff's activities of daily living, which Harding summarized. (73).

In sum, the Court does not agree that the ALJ erred by failing to properly explain how he reconciled the medical opinions.

<u>The ALJ's Credibility Determination</u>

Plaintiff next contends that the ALJ's credibility determination was based upon a "misreading of the evidence."[10]  According to Plaintiff, "[t]he ALJ diminished Plaintiff's credibility for three main reasons: the ALJ did not believe Plaintiff's activities of daily living were sufficiently limited; [Plaintiff] had not been engaged in 'consistent' treatment; and [Plaintiff] had tried to work since his alleged onset date."[11]  However, Plaintiff insists

---

[9]*See*, (74), at very top.  Harding accurately listed Ransom's findings, and indicated that he gave Ransom's report "great weight." The Court notes that the cm/ecf filing system has overwritten the docket information over this portion of Harding's report, but Harding's indication that he gave Ransom's opinion great weight is still legible.

[10]Pl. Memo of Law [#10-1] at p. 18.

[11]Pl. Memo of Law [#10-1] at p. 19.

that his daily activities do not translate into an ability to work.  Further, Plaintiff contends

that he actually consistently sought mental health treatment, and that, to the extent that

he did not, it may have been because of his mental illness.  Additionally, Plaintiff

maintains that his limited attempts to work after the alleged onset date are irrelevant,

"because he never actively worked as a barber or [real estate] broker, and there is no

indication that his efforts were indicative in any way of th[e] actual ability to work."[12]

     Plaintiff's arguments on this point lack merit.  For instance, the ALJ correctly

observed that Plaintiff had made inconsistent statements about his daily activities.

Indeed, it is fair to say that the record is replete with contradictory statements by

Plaintiff, about his activities, that detract from his credibility.  An example is the

information that Plaintiff provided when he applied for SSI benefits, which includes

assertions that he  was unable to care for his personal hygiene (179-180), was

completely unable to perform household chores or yard work due to "fatigue, fever"

(181), was unable to handle money (182), and needed a cane to ambulate. (184-185).

It appears that all of those statements were false, since they are clearly refuted by the

rest of the record, including Plaintiff's own statements to Ransom just one month after

he filled out the application. (311).  The ALJ noted one of those inconsistencies in his

decision. (14) ("He states he has problems with his personal care and needs reminders,

however treatment notes state he has good hygiene and is well groomed.").  The ALJ

also accurately noted a number of other inconsistencies in Plaintiff's statements about

his daily activities. *See, e.g.*, (16) (Plaintiff's claims of physical pain and limitation are

---

[12]Pl. Memo of Law [#10-1] at pp. 19-21.

inconsistent with his activities at the YMCA); (17) (Plaintiff claims to be disabled but told ACCES-VR that he "could work full time but did not want a high stress job or to be in 'crowded environments.'"); (15) (Plaintiff claims to live in his car but apparently spends his days at his mother's house using the computer). It was not improper for the ALJ to consider these statements about Plaintiff's activities of daily living when evaluating Plaintiff's credibility.

Plaintiff nevertheless argues that even if the ALJ disbelieved him, his activities of daily living do not show an ability to work on a sustained basis.[13] However, some of Plaintiff's statements about activities of daily living suggest that he has a greater ability to work on a regular and continuing basis than he claims. The ALJ noted, for example, that Plaintiff denied having any "problems with memory and concentration," and that he regularly worked out at the YMCA. (16).

Similarly, the ALJ's consideration of Plaintiff's inconsistent efforts to obtain treatment, when evaluating Plaintiff's credibility, was also not improper. In that regard, the ALJ correctly noted that Plaintiff "only sought treatment at the time of his application[14] and ha[d] not been engaged or consistent in attending therapy sessions or [in] complying with medication." (17). Indeed, immediately after Plaintiff was released from jail in 2013, and without making any attempt to work, Plaintiff sought treatment from Unity and within days thereafter filed his application for SSI benefits, but only

---

[13]Pl. Memo of Law [#10-1] at p. 19.

[14]This does not mean, as Plaintiff suggests, that Plaintiff only sought treatment at the time of his application and then did not continue with treatment. *See*, Pl. Memo of Law [#10-1] at p. 20. Rather, the Court understands the ALJ to mean that Plaintiff did not begin seeking therapy for his mental health until the Summer of 2013, which coincided with his application for SSI benefits.

continued with treatment at Unity for a few months.  Several months later Plaintiff

began treatment again through Genesee Mental Health, but again missed many

appointments, causing Caponi to write that Plaintiff was "non-engaged in therapy."

(337).

Plaintiff contends that he actually was diligent in obtaining treatment all along, or,

alternatively, that his mental illness prevented him from following-through on

treatment.[15]  However, records from both Unity and Genesee Mental Health attest to

Plaintiff's repeated failures to attend scheduled sessions.  As for why Plaintiff missed

those appointments, he previously told a treatment provider at Genesee Mental Health

that he had stopped attending sessions at Unity because he was busy looking for a job.

(342).  At the hearing, when the ALJ asked Plaintiff why he had missed appointments,

Plaintiff offered various excuses, such as forgetfulness and problems with housing and

transportation (32, 46), even though he had no similar difficulty maintaining his regular

attendance at the YMCA, three to five times per week. (47, 15).  Therefore, contrary to

Plaintiff's suggestion, the ALJ properly explored the reasons why Plaintiff was less than

diligent in pursuing treatment.

Lastly, the ALJ's observation that Plaintiff's attempts to find work detract from his

credibility is also supported by substantial evidence. (17).  Plaintiff claims that the ALJ's

reference to his attempts to work, as part of the ALJ's credibility analysis, was improper,

and that the ALJ was punishing him for "having goals."[16]  Plaintiff further contends that

---

[15]Pl. Memo of Law [#10-1] at pp. 20-21.

[16]Pl. Memo of Law [#10-1] at p. 21 ("[T]he ALJ drew an adverse inference from Plaintiff *even attempting* to work during the relevant period.") (emphasis in original).

his attempts at work were not "indicative in any way of [an] actual ability to work."[17] However, the Court disagrees. Contrary to Plaintiff's argument, the ALJ did not disbelieve him merely because he expressed interest in employment. Rather, as the ALJ noted, Plaintiff made statements to ACCES-VR that are inconsistent with his disability claim. (17). Most notably, Plaintiff stated that he was capable of working full time. (247). The ALJ further observed that according to Caponi, Plaintiff's work ability was "excellent," when not working in groups and when the work interested him. (263). It was not improper for the ALJ to consider these factors when assessing Plaintiff's credibility.

CONCLUSION

Plaintiff's application for judgment on the pleadings [#10] is denied, and Defendant's cross-motion [#13] for judgment on the pleadings is granted. The action is dismissed.

So Ordered.

Dated: Rochester, New York          ENTER:
     May 22, 2017


                                  /s/ Charles J. Siragusa
                                  CHARLES J. SIRAGUSA
                                  United States District Judge

---

[17]Pl. Memo of Law [#10-1] at p. 21.